ANNA K. STIMMEL (State Bar No. 322916)
KATRINA A. TOMAS (State Bar No. 329803)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, California 94111
Telephone: (415) 217-2000
Facsimile: (415) 217-2040
astimmel@earthjustice.org
ktomas@earthjustice.org

Attorneys for Plaintiffs PACIFIC COAST
FEDERATION OF FISHERMEN'S
ASSOCIATIONS and INSTITUTE FOR
FISHERIES RESOURCES

KEVIN P. BUNDY (State Bar No. 231686)
MATTHEW S. McKERLEY (State Bar No. 332160)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone: (415) 552-7272
Facsimile: (415) 552-5816
bundy@smwlaw.com
mmckerley@smwlaw.com

Attorneys for Plaintiffs FRIENDS OF THE EEL
RIVER, CALIFORNIA TROUT, and TROUT
UNLIMITED

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, EUREKA-McKINLEYVILLE DIVISION

| | |
|---|---|
| FRIENDS OF THE EEL RIVER; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; INSTITUTE FOR FISHERIES RESOURCES; CALIFORNIA TROUT; and TROUT UNLIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> PACIFIC GAS AND ELECTRIC COMPANY, <br><br> Defendant. | Case No. 1:23-cv-2379 <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## **INTRODUCTION**

1. Friends of the Eel River, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, California Trout, and Trout Unlimited (together, "Plaintiffs") bring this action pursuant to Section 11(g) of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. §§ 1531-1544, against Pacific Gas and Electric Company ("PG&E" or "Defendant") for causing the illegal "take" of threatened California Coastal ("CC") Chinook salmon and Northern California ("NC") steelhead trout (together referred to as "salmonids") in the Eel River watershed.

2. Plaintiffs challenge PG&E's ongoing operation and maintenance of the Potter Valley Hydroelectric Project ("Potter Valley Project" or "Project"), Federal Energy Regulatory Commission ("FERC") Project No. 77, which PG&E has operated and maintained and continues to operate and maintain in violation of Section 9 of the ESA, *id.* §§ 1538(a)(1)(B), (G), by harming and harassing, and thereby causing unauthorized "take" of, CC Chinook salmon and NC steelhead.

3. The Potter Valley Project consists of Scott Dam and its associated reservoir, Lake Pillsbury; Cape Horn Dam and its associated reservoir, Van Arsdale Reservoir; a diversion tunnel; and a small powerhouse located on the East Branch Russian River. Scott Dam does not have fish passage facilities and, accordingly, completely prevents migrating fish from accessing hundreds of stream-miles of high-quality habitat that these fish species used historically. Cape Horn Dam does provide some fish passage via its fishway, the longest and tallest in California, to the twelve miles of the Eel River located between the dams. However, the Cape Horn Dam fish ladder does not function during and after periods of high flows. As well, the fish passage facilities subject CC Chinook salmon and NC steelhead to increased predation of both adults attempting to pass above Cape Horn Dam to spawn, and juveniles trying to head downstream to the Pacific.

4. The maximum capacity of the powerhouse is a nominal 9.2 megawatts when operational. The powerhouse has not been operational for several years due to the lack of a functional transformer and it has not operated at capacity since 2002. In a March 22, 2023 letter to FERC, PG&E stated it does not plan to replace the transformer.

5. The Project functions as an inter-basin transfer system, diverting water from the Eel River to the Russian River across a natural divide. In so doing, it leaves less water in the Eel River

than would be present absent the Project. In addition to impacting the amount of water in the Eel River between and below the dams, PG&E's operation and maintenance of the Project controls the timing and temperature of the coordinated water releases to the Eel River from Scott and Cape Horn Dams.

6.      Historically, annual averages of approximately 800,000 CC Chinook salmon and 150,000 NC steelhead returned to the Eel River to spawn, making the Eel River the third most productive salmon river in California and fourth most productive in the continental United States. Due in part to PG&E's operation and maintenance of the Potter Valley Project, populations of both CC Chinook and NC steelhead in the upper Eel River have drastically declined from early 20th Century levels. For example, as a direct result of profound environmental changes, including damage done by the Project, only about 1,000 adult Chinook return to the Cape Horn fish ladder in most years now. Similarly, over the past 40 years NC steelhead have seen disastrous declines.

7.      PG&E's operation and maintenance of the Project has caused and is causing take of CC Chinook salmon and NC steelhead by (1) maintaining water temperatures below Cape Horn and Scott dams harmful to those species; (2) operating Cape Horn Dam and its fishway in a manner that increases the risk of injury and directly causes death and injury to ESA-protected fish; (3) blocking and impeding access to salmonid spawning habitat above Cape Horn and Scott dams; and (4) inhibiting out-migration by juvenile salmonids.

8.      PG&E's operation and maintenance of the Project causes take by failing to maintain water temperatures, both above and below Cape Horn Dam, at a level conducive to salmonid survival. In particular, high water temperatures below Scott Dam have harmed NC steelhead and reduced overall production. These high temperatures have also exacerbated predation of NC steelhead by Sacramento pikeminnow and other invasive fish.

9.      PG&E's operation and maintenance of Cape Horn Dam is also causing death and injury to ESA-listed species. Downstream migrating juvenile salmonids have been observed to tumble over the face of Cape Horn Dam directly onto rocks below. PG&E is directing water to spill over the dam without adequate safeguards to prevent protected juvenile fish from falling to their death and injury.

10. PG&E is also harming and harassing the fish by operating and maintaining a fishway at Cape Horn Dam that subjects CC Chinook and NC steelhead to increased predation as they make their way both up and down the fish ladder. The Eel River channel is approximately 100 feet wide in the reach around Cape Horn Dam. But fish are restricted to a four-foot-wide channel in the fishway without natural cover, rendering them highly vulnerable to predation. Adults moving upstream face predation from otters, birds, raccoons, and bears. To pass downstream, juvenile salmonids must survive a gauntlet of predatory pikeminnow and bass above the fish ladder. Predation is not only an issue when the fishway is open; when the fishway is closed due to high flows, salmonids are vulnerable to predation as they attempt to hold above and below Cape Horn Dam.

11. PG&E's operation and maintenance of the Project blocks and impedes access to salmonid spawning habitat and hinders out-migration by juveniles, significantly impairing essential spawning, migrating, and breeding behavior. Scott Dam lacks any fish passage facilities and thus completely blocks salmonid access to hundreds of miles of high-quality spawning and rearing habitat above the dam. Similarly, Cape Horn Dam restricts fish passage to the remaining habitat between Cape Horn and Scott Dam, exposing juveniles and adults to predation as they navigate the longest and highest fishway in the State of California.

12. The Cape Horn Dam fishway's substandard design also requires its frequent closure during times when threatened fish are migrating to their spawning habitat above Cape Horn Dam. The fishway often becomes clogged with debris after periods of high flow. Furthermore, when flows exceed 6,000 cubic feet per second ("cfs"), PG&E closes the fish ladder inlet at the top of the fish ladder to one inch, effectively shutting down the fish ladder and rendering the fishway unusable. Blockages and closures of PG&E's Cape Horn fishway have repeatedly impaired migration of salmonids in recent years.

13. A biological opinion issued in 2002 by the National Marine Fisheries Service ("NMFS" or "Service") incorporated an incidental take statement, which authorized the incidental take of CC Chinook salmon and NC steelhead caused by some aspects of Potter Valley Project operations. But that take authorization does not currently exempt PG&E from Section 9 liability for two reasons. First, the biological opinion and incidental take statement have expired. Second, the

biological opinion and incidental take statement are separately invalid because the Project is causing take of salmonids in ways not anticipated by, and from activities not described in, the biological opinion. Without any take authorization, PG&E's operation and maintenance of the entire Project is causing ongoing unlawful take of CC Chinook salmon and NC steelhead.

14.    The 2002 biological opinion found that the operation of the Project as proposed was likely to jeopardize the continued existence of CC Chinook salmon and NC steelhead. Accordingly, it required FERC and PG&E to implement a reasonable and prudent alternative to avoid jeopardy. At the time it issued the biological opinion, NMFS anticipated that the flow measures required by the reasonable and prudent alternative would avoid jeopardy and support salmonid recovery efforts. However, populations of Chinook and steelhead in the Project area have not recovered. Chinook returns to the Van Arsdale fish station at Cape Horn Dam have not been higher than 588 adults in the last decade, while steelhead returns rarely exceed a few hundred adults in even the best recent years. At such low population levels, predation, disease, and stochastic events like variations in the sex of returning adults, changes in ocean conditions, drought, storms, wildfire, earthquakes, and landslides all pose a much greater risk of jeopardizing the survival of the listed species than they would if upper Eel River salmonid populations numbered in even the tens of thousands.

15.    Plaintiffs seek a declaration that Defendant has violated and continues to violate the ESA by taking listed CC Chinook salmon and NC steelhead without authorization. Plaintiffs also seek preliminary and permanent injunctions prohibiting Defendant from continuing to operate the Potter Valley Project in a manner that violates Section 9 of the ESA, 16 U.S.C. §§ 1538(a)(1)(B), (G), and the Act's implementing regulations.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because the action arises under the laws of the United States, and under 16 U.S.C. §§ 1540(c) and (g) because the action arises under the ESA. An actual, justiciable controversy now exists between Plaintiffs and Defendant, and the requested relief is proper under 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 2202 (injunctive relief), and 16 U.S.C. § 1540(g) (citizen suit provision of the ESA).

17. Plaintiffs provided Defendant and the U.S. Secretary of Commerce with notices of intent to sue over the violations of law alleged in this Complaint more than sixty (60) days ago. *See* 16 U.S.C. § 1540(g)(2). Attached as Exhibits 1 and 2 are true and correct copies of the letters sent by Plaintiffs to Secretary of Commerce Gina M. Raimondo and Brian M. Wong, PG&E's registered agent for service of process, on April 15, 2022 and November 14, 2022.

18. Defendant has not remedied the violations of law complained of, and these violations of law are reasonably likely to continue to occur. To the best of Plaintiffs' knowledge, the United States has not commenced any action to enforce the Act.

19. This Court has personal jurisdiction over Defendant because Defendant is domiciled in, was served with process in, or maintains its principal place of business in California.

20. Venue is proper in this District pursuant to 16 U.S.C. § 1540(g)(3)(A), 28 U.S.C. § 1391(b)-(c), and 28 U.S.C. § 84(a) because the ESA violations are occurring in Mendocino County, which is part of this District.

21. Pursuant to Civil Local Rules 3-2(c) and (f), this action is properly assigned to the Eureka-McKinleyville Division of this Court because a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred in Mendocino County.

## PARTIES

### Plaintiffs

22. Friends of the Eel River ("FOER") is a nonprofit citizens' group that advocates for policies and practices consistent with the protection and recovery of the Wild and Scenic Eel River's outstanding resource values, particularly the salmonid species protected under the federal and California ESAs. Founded in 1998 and headquartered in Eureka, California, FOER is a membership organization of thousands of concerned conservationists from Humboldt, Mendocino, Sonoma, Marin, and other counties who are dedicated to protecting and restoring the Eel River watershed and its dependent fish and wildlife. FOER and its members work with, use, and enjoy the Eel River and its fisheries in the areas surrounding the Project and in Project-affected areas for scientific, recreational, aesthetic, and educational purposes, including but not limited to monitoring, research, fishing, viewing, and enjoyment of the outdoors. For example, FOER member Samantha Kannry has

6

1    monitored and studied Eel River salmon and steelhead and stream conditions, including in portions

2    of the watershed affected by the Potter Valley Project, in her professional capacity for the past 13

3    years. Ms. Kannry's published research has helped establish, among other things, that the resident

4    rainbow trout population trapped above Scott Dam retains the genetic legacy of their ancestral

5    steelhead, including summer steelhead. In the time that Ms. Kannry has spent on the Eel River and

6    its tributaries, she has also developed a profound personal connection with the Eel River and its

7    fisheries. Ms. Kannry's personal and professional interests are harmed by PG&E's violations of the

8    ESA. FOER and its members have a direct interest in the recovery of the Eel River's threatened

9    fisheries. FOER and its members have also invested significant time, money, and energy in

10    advocating for the recovery of unique Eel River salmonids. FOER's and its members' interests are

11    directly and adversely affected by PG&E's continued violations of the ESA and implementing

12    regulations, which are causing substantial harm to ESA-listed salmonids in the Eel River watershed.

13    FOER's and its members' injuries are directly traceable to PG&E's violations of ESA Section 9, and

14    the relief FOER seeks in this lawsuit would redress that injury. FOER has actively participated in

15    prior proceedings related to Defendant's license for operation of the Potter Valley Project, and

16    FOER has repeatedly raised serious concerns with FERC regarding the inadequate design and

17    operation of the Cape Horn Dam fish passage facility.

18         23.    Pacific Coast Federation of Fishermen's Associations ("PCFFA") is a California

19    nonprofit organization and the West Coast's largest trade organization for commercial fishing vessel

20    owners and family commercial fishing operations. PCFFA is a federation of 17 different local

21    commercial fishermen's port associations, regional vessel or gear type commercial boat owners, and

22    regional fisheries marketing associations, 14 of which are located in California. Since 1976, PCFFA

23    has advocated to ensure the rights of individual fishermen and fishing-dependent families and

24    communities, and to fight for the long-term survival of commercial fishing as a livelihood and way

25    of life. PCFFA has actively participated in the Project's licensing process at various levels, including

26    reviewing and providing written comments on major scoping, draft and final National

27    Environmental Policy Act ("NEPA") documents, providing economic and socioeconomic

28    information, and working within the collaborative process. PCFFA's member associations

1  collectively represent nearly 800 commercial fishing families, most of whom are small and mid-

2  sized commercial fishing boat owners and operators, many of whom make their livelihoods in whole

3  or in part from harvesting salmon in the oceans originating from West Coast watersheds. PCFFA is

4  funded primarily by assessments of its member associations based on the amounts of fish harvested

5  annually by the individual members of those associations, and those member associations are also in

6  turn dependent for their funding on their individual members' success in annual harvests, especially

7  of fall Chinook salmon, which was once the workhorse species of all West Coast fisheries. Many

8  commercial salmon harvests along the West Coast are influenced or managed in accordance with Eel

9  River-origin salmon run abundance levels, and thus, the livelihoods of PCFFA's members who rely

10  on ocean harvest of Pacific salmon are greatly affected by the health and abundance (or lack thereof)

11  of once numerous Eel River-origin salmon. The decline of the Eel River Chinook salmon species has

12  severely impacted PCFFA members in California by limiting commercial harvest opportunities, both

13  through lost production of the impaired stocks and because of "weak stock management" restrictions

14  imposed on the fishing fleet as a whole in order to protect the most impaired salmon populations

15  when multiple populations intermingle in the ocean. These severe harvest restrictions result in tens

16  of millions of dollars in lost salmon harvest economic opportunities. Unauthorized take caused by

17  PG&E's operation and maintenance of the Potter Valley Project has harmed and is harming the

18  interests of PCFFA and its members, whose livelihoods are adversely affected by the Potter Valley

19  Project's negative effects on Eel River-origin salmon. For example, David Bitts is a member of

20  PCFFA and a commercial fisherman based in Eureka, CA whose interests are impacted by PG&E's

21  unauthorized take of listed salmonids on the Eel River. Mr. Bitts makes his livelihood fishing for

22  salmon and crab and experiences decreasing salmon harvests as a result of the diminished salmon

23  populations in the Eel River caused by PG&E's operation and maintenance of the Potter Valley

24  Project. Additionally, PCFFA as an organization directly suffers financial harm from reduced

25  salmon harvests because its revenues are directly related to the success of harvests by its members in

26  West Coast fisheries. The relief sought in this action will redress PCFFA's and its members' injuries

27  by preventing unauthorized take of listed salmonids, which in turn will contribute to the recovery of

28  Eel River salmonid populations.

24.     Institute for Fisheries Resources ("IFR") is a nonprofit, public interest, marine resources protection and conservation organization dedicated to protecting the natural resources and seafood bounty of the Pacific Ocean along the western seaboard of North America. IFR was originally founded by PCFFA in 1992 and currently is separate from but still closely affiliated with PCFFA. IFR both funds and implements PCFFA's salmon watershed restoration priorities. Since its founding, IFR has worked on salmon habitat restoration efforts in the Eel River Basin, including the commitment of substantial staff time and financial resources over many years. Along with PCFFA, IFR has actively participated in the Project's licensing process at various levels, including reviewing and providing written comments on major scoping, draft, and final NEPA documents; providing economic and socioeconomic information; and working within the collaborative process. IFR also runs an active salmon watershed protection and restoration program, and its members, most of whom are commercial salmon fishermen or women, also have personal as well as economic interests in the restoration of Eel River salmon. PG&E's operation and maintenance of the Potter Valley Project has harmed and is harming the interests of IFR and of its members. For example, David Bitts, who is a member of IFR in addition to PCFFA, is harmed by PG&E's take of Eel River salmon because of its impact on his commercial fishing interests and income, as discussed above. The relief sought in this action will redress IFR's and its members' injuries by preventing unauthorized take of listed salmonids and contributing to their recovery.

25.     California Trout ("CalTrout") is a nonprofit organization of conservation-minded members dedicated to ensuring healthy waters and resilient wild fish by driving innovative, science-based solutions that work for the diverse interests of fish, water, and people; building partnerships in key geographies where wild fish influence the community; and using project successes to establish precedent and influence statewide policy. Founded in 1971, CalTrout is a statewide conservation organization supported by approximately 10,000 individual members and 50 affiliate local angling clubs representing approximately another 4,000 persons. CalTrout has six regional offices, one of which is located in Arcata, California. CalTrout conducts multiple restoration projects on the Eel River and is dedicated to the protection and enjoyment of the Eel River watershed and its fish populations. Members of CalTrout live and work in the vicinity of the Eel River and its tributaries

and use and enjoy the River and its natural and aesthetic values. For example, CalTrout members Joe Furgerson and Jeff Thompson fish for steelhead in the Eel River and hope to be able to fish for steelhead in the future with the restoration of the fishery. Both Mr. Furgerson and Mr. Thompson have plans to return to the Eel River to fish, including the reaches of the river most affected by the Potter Valley Project, and both members have developed a close, personal connection with the Eel River and its steelhead fishery. Mr. Furgerson's and Mr. Thompson's personal interests are harmed by PG&E's violations of the ESA. CalTrout and its members have a direct interest in the recovery of the Eel River's threatened fisheries. CalTrout's members' interests are directly and adversely affected by PG&E's continued violations of the ESA and implementing regulations, which are causing substantial harm to ESA-listed salmonids in the Eel River. CalTrout's members' injuries are directly traceable to PG&E's violations of ESA Section 9, and the relief CalTrout seeks in this lawsuit would redress those injuries. CalTrout has participated actively in both formal and informal proceedings related to the Project for many years, including as an applicant for the Project license.

26.     Trout Unlimited ("TU") is North America's leading coldwater fisheries conservation organization, with more than 400 chapters and 300,000 active members and supporters dedicated to the conservation, protection, and restoration of trout and salmon fisheries and their watersheds. TU's vision is that trout and salmon will be restored throughout their native range so that the next generation can enjoy healthy fisheries in their home waters. To accomplish this vision, TU works to protect, reconnect, and restore fish populations and their habitat, and to sustain this work by building a diverse movement of businesses, people, and communities dedicated to its mission. The Eel River is one of TU's highest priorities. TU's staff and partners have invested close to $10 million in habitat restoration throughout the Eel River basin, through dozens of separate fisheries restoration projects. TU's members include passionate anglers, fishing guides, local business owners who support the recreational fish economy, and Californians from a variety of walks of life, who live and operate in, or regularly visit, the Eel River. For example, TU member Richard Jorgensen has fished the Eel River since 1968 and plans to fish the river in the future three to four times a year. Over the years that Mr. Jorgensen has fished the river, he has witnessed the severe decline in the Eel River's steelhead populations. Mr. Jorgensen's personal interests are harmed by PG&E's violations of the

ESA. Many of TU's members have worked to restore the Eel River and its tributaries and to curtail practices that harm the Eel River watershed and its threatened salmon and steelhead fisheries. TU's members have entrenched recreational, economic, aesthetic, scientific, and cultural interests in preserving the Eel River's threatened fisheries. These interests are directly and adversely affected by PG&E's continued violations of the ESA and implementing regulations, which are causing substantial harm to ESA-listed salmonids in the Eel River watershed. TU's injuries are directly traceable to PG&E's violations of ESA Section 9, and the relief TU seeks in this lawsuit would redress that injury.

27.    The aesthetic, recreational, professional, scientific, and other interests of Plaintiffs and their members in observing, studying, protecting, fishing for, and otherwise enjoying CC Chinook salmon and NC steelhead and their Eel River habitat are impaired by Defendant's take of these species in violation of the ESA. By continuing to operate the Potter Valley Project in a manner that causes unlawful take of listed species, Defendant is causing Plaintiffs' injuries. The relief sought in this lawsuit redresses the injuries to Plaintiffs' interests.

28.    Neither the claims asserted nor the relief requested in this action require the participation of individual members of the Plaintiff organizations.

## Defendant

29.    Defendant PG&E is an investor-owned utility incorporated and existing under the laws of the State of California whose principal office is located in San Francisco, California. PG&E is engaged in the generation, purchase, transmission, and distribution of electricity in a monopoly service territory in Northern and Central California. PG&E is the owner and operator of the Potter Valley Project pursuant to a license issued by FERC.

30.    Defendant is a "person" under the ESA and subject to the ESA's requirements and prohibitions.

## STATUTORY BACKGROUND

### Endangered Species Act

31.    The ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. V. Hill*, 437 U.S. 153, 180 (1978). Its

primary purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

32.   The ESA defines a "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

33.   Section 4 of the ESA requires NMFS, the federal agency that administers the ESA with respect to most marine species, to list species as "endangered" or "threatened" when they meet the statutory listing criteria. *Id.* § 1533. An "endangered" species is "in danger of extinction throughout all or a significant portion of its range," and a "threatened" species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(6), (20).

34.   Once a species is listed, the ESA provides a variety of procedural and substantive protections to ensure not only the species' survival, but also its ultimate recovery. Section 9 of the ESA makes it "unlawful for any person" to "take any [endangered] species within the United States or the territorial sea of the United States." *Id.* § 1538(a)(1)(B). The prohibition on "take" also applies to certain threatened species, including CC Chinook salmon and NC steelhead. 50 C.F.R. §§ 223.102, 223.203; *see* 16 U.S.C. § 1533(d) (authorizing Secretary of Commerce to promulgate regulations extending Section 9 "take" prohibitions to threatened species). It is also unlawful "for any person" to "cause to be committed" any offense described in Section 9, including take of endangered species, or a violation of regulations pertaining to threatened and endangered species. 16 U.S.C. § 1538(g).

35.   Congress intended the term "take" to be defined in the "broadest possible manner to include every conceivable way" in which a person could harm or kill wildlife. S. Rep. No. 93-307, 93d Cong., 1st Sess. 1, reprinted in 1973 USCAAN 2989, 2995. The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

36.     The term "person" includes "an individual, corporation, partnership, trust, association, or any other private entity." *Id.* § 1532(13).

37.     Department of Commerce regulations define "harm" as "an act which actually kills or injures fish or wildlife," including "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding, or sheltering." 50 C.F.R. § 222.102. Harm may be direct or indirect and need not be purposeful. *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995); *see* Endangered and Threatened Wildlife and Plants; Definition of "Harm", 64 Fed. Reg. 60727, 60729 (Nov. 8, 1999) (noting that Department of Commerce's definition of "harm" is consistent with Court's holding in *Sweet Home*).

38.     Significant habitat modification also may constitute harm if it results in death or injury to wildlife. *Sweet Home*, 515 U.S. at 708. The Department of Commerce's final rule on the definition of "harm" presents a non-exclusive list of habitat-modifying activities that could fall within the definition. 64 Fed. Reg. at 60730. These activities include "[c]onstructing or maintaining barriers that eliminate or impede a listed species' access to habitat or ability to migrate and constructing or operating dams or water diversion structures with inadequate fish screens or fish passage facilities in a listed species' habitat." *Id.*

39.     While the Department of Commerce has not specifically defined "harass," the Department has issued guidance on the term. The guidance defines "harass" to mean "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." Nat'l Marine Fisheries Serv., 02-110-19, *Interim Guidance on the Endangered Species Act Term "Harass"* 2 (Dec. 21, 2016). Injury is "likely" if there is a "reasonable connection between the annoyance (taking into account its magnitude, duration, frequency, and scope) and the behavioral response on the part of the animal(s) exposed to the disturbance that would be expected to result in the creation or increased risk of injury to the animal." *Id.* To qualify as a "significant disruption" the annoyance must cause "a change in the animal's behavior (breeding, feeding, sheltering, resting, migrating, etc.) that could reasonably be expected,

alone or in concert with other factors, to create or increase risk of injury to an ESA-listed animal when added to the condition of the exposed animal before the disruption occurred." *Id.*

40.     The District Court for the Eastern District of California explained the difference between "harm" and "harass" as follows: " 'Harm' . . . 'may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavior patterns . . . .' Harassment on the other hand occurs when an act annoys fish to the point where they significantly modify their behavior." *Westlands Water Dist. v. U.S. Dept. of Int.*, 275 F. Supp. 2d 1157, 1225 (E.D. Cal. 2002), *rev'd in part on other grounds and remanded*, 376 F.3d 853 (9th Cir. 2004). Thus, while both harm and harassment include significant disruption or impairment of behavior patterns such as breeding or migrating, harm requires the disruption to cause reasonably certain death or injury, while harassment requires only that the disruption create or increase the risk of injury to the animal.

41.     Section 7(a)(2) of the ESA imposes on federal agencies the ongoing substantive duty to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence" of any listed species or destroy or adversely modify a listed species' designated critical habitat. 16 U.S.C. § 1536(a)(2).

42.     To gain assistance in complying with Section (7)(a)(2)'s mandate to avoid causing jeopardy to any listed species, an agency must consult with NMFS whenever its actions "may affect" a listed anadromous salmonid species. 50 C.F.R. § 402.14(a); *see also* 16 U.S.C. § 1536(a)(2). "The purpose of consultation is to obtain the expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts." *Karuk Tribe v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (citing *Turtle Island Restoration Network v. NMFS*, 340 F.3d 969, 974 (9th Cir. 2003)). If the agency determines its actions "may affect" listed species or critical habitat, "formal consultation is [generally] required." 50 C.F.R. § 402.14(a).

43.     At the close of formal consultation, NMFS must issue a biological opinion that advises whether the action is "likely to jeopardize the continued existence of the listed species or

result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4). If NMFS concludes that the action is likely to jeopardize a listed species or destroy or adversely modify its critical habitat, it must identify and describe any reasonable and prudent alternative to the proposed action that it believes would avoid jeopardy and adverse modification. 16 U.S.C. § 1536(b)(3)(A). If NMFS determines that either the proposed action or a reasonable and prudent alternative is not likely to jeopardize a listed species or adversely modify its critical habitat, it may issue an incidental take statement for any take of a listed species that occurs as an incidental consequence of the action. 50 C.F.R. § 402.14(i). When an incidental take statement is issued, "[a]ny taking that is in compliance with the terms and conditions specified in a written [incidental take] statement . . . shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

44.     Even if a federal agency has previously initiated and completed formal consultation, the agency is required to reinitiate consultation when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2). "When reinitiation of consultation is required, the original biological opinion loses its validity, as does its accompanying incidental take statement, which then no longer shields the action agency from penalties for takings." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1108 (9th Cir. 2012).

45.     The citizen suit provision of the ESA authorizes any person to bring a civil suit against any person who is alleged to be in violation of the Act or any regulation issued under the Act. 16 U.S.C. § 1540(g)(1). A plaintiff can seek to enjoin both present activities that constitute an ongoing take and future activities that are reasonably likely to result in take. *See Natl. Wildlife Fedn. V. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir. 1994).

46.     Where a violation of the Section 9 "take" prohibition is alleged, a Court must issue an injunction if a plaintiff establishes by a preponderance of the evidence that there is "a reasonably certain threat of imminent harm to a protected species." *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000). Because Congress has accorded the protection of endangered species the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. XX-cv-XXXX

highest priorities, courts do not have the discretion to withhold injunctive relief where it is necessary to prevent an imminent and likely violation of the ESA. *Tennessee Valley Auth.*, 737 U.S. at 184.

## FACTUAL BACKGROUND

47.     CC Chinook salmon (*Oncorhynchus tshawytscha*) and NC steelhead trout (*Oncorhynchus mykiss*) are both ESA-listed threatened species that spawn, rear, migrate, feed, and shelter in the Eel River and that have been, and are being, taken by Defendant's operation and maintenance of the Potter Valley Project.

### California Coastal Chinook salmon

48.     CC Chinook salmon make up an evolutionarily significant unit of Chinook salmon. Chinook salmon are a salmonid species that historically ranged throughout much of the North American and northeast Asian Pacific coast—from the Ventura River in southern California north to Point Hope, Alaska, and in Asia from Hokkaido, Japan to the Anadyr River in Russia. Today, however, Chinook Salmon are the least abundant Pacific salmon in North America.

49.     Chinook salmon are the largest sized member of genus *Oncorhynchus*, with some adults weighing more than 120 pounds. Chinook salmon are anadromous; they are born in freshwater and spend most of their lives in saltwater, but return to freshwater to spawn. There are two types of Chinook—ocean-type fish and river-type fish—reflecting their two main life history strategies. Chinook salmon in the Eel River today are ocean-type, fall-run fish that spawn shortly after entering freshwater and whose offspring emigrate back to the ocean shortly after emergence from their nest and spawning beds. Though the timing can vary, adult Chinook salmon enter the Eel River as early as August, with spawning occurring from October through February. The loss of the historic spring-run or river-type Chinook life history has robbed Eel River populations and the entire CC Chinook evolutionarily significant unit of critical genetic diversity.

50.     CC Chinook salmon population numbers today have declined to levels far below recovery targets, approaching or exceeding high-risk depensation thresholds (i.e., reductions in egg survival and productivity) due to shrinking effective spawning populations. Their shrinking population has made Chinook vulnerable to earthquakes, landslides, droughts, and flooding, resulting in reductions in genetic diversity, altered breeding structure, and shifts in population

dynamics. Recent studies estimate that abundance of CC Chinook has decreased by more than 90% from historical numbers. Eel River runs of Chinook salmon historically numbered as many as 800,000 fish per year, declining to approximately 1,000 fish per year in the 1990s and 2000s.

51.     When the Department of Commerce first proposed extending ESA Section 9 protections to CC Chinook salmon in 2001, it cited past and ongoing freshwater and estuarine habitat destruction and hydropower development, among other causes, as primary sources of population depletion. Anthropogenic watershed disturbances—including disturbances caused by water diversions and dam building—have contributed to the loss and degradation of CC Chinook salmon essential habitat. This loss of habitat is a primary cause of the high and increasing risk of extinction faced by CC Chinook salmon in the Eel River.

52.     Sacramento pikeminnow, which were introduced illegally into the Eel River in 1979 via PG&E's Lake Pillsbury reservoir and spread throughout much of the watershed, also have suppressed CC Chinook salmon populations through predation on juveniles throughout the watershed.

53.     Natural cold-water flows, unimpeded by dams, remain *the* major requirement for Chinook embryo and juvenile survival.

54.     CC Chinook salmon in the Eel River have been listed as threatened, and therefore protected, under the ESA since September 1999. Endangered and Threatened Species; Threatened Status for Two Chinook Salmon Evolutionarily Significant Units (ESUs) in California, 65 Fed. Reg. 50,394 (September 16, 1999) (to be codified at 50 C.F.R. pt. 223); 50 C.F.R. § 223.102. Their designated critical habitat includes the Eel River below Scott dam. 50 C.F.R. § 226.211(f)(5).

**Northern California steelhead trout**

55.     In North America, steelhead are the anadromous form of rainbow trout (*Onchorynchus mykiss*), a salmonid species found in coastal streams from Alaska south to northwestern Mexico. Steelhead are divided into two reproductive ecotypes. Stream maturing steelhead require several months to mature and spawn after they enter fresh water. Ocean maturing steelhead enter fresh water in a sexually mature state and spawn shortly after river entry. These two

1  types of steelhead are more commonly referred to by their season of freshwater entry—summer

2  (stream maturing) and winter steelhead (ocean maturing).

3      56.    The Eel River is the most important river for NC steelhead in the region and

4  historically supported between 100,000 and 150,000 winter and summer steelhead combined. Over

5  the past 40 years, steelhead have also seen disastrous declines in the Eel River. Returns of NC

6  steelhead to the Van Arsdale Fisheries Station at Cape Horn Dam over the last two decades of

7  PG&E's management tell a dismal story to fisheries biologists, with annual counts now in the mere

8  hundreds or even dozens of adults.

9      57.    The Potter Valley Project has been a major cause of harm and injury to steelhead in

10  the Eel River. NMFS noted in 2002, for example, that the inadequate fish ladder at Cape Horn Dam

11  has historically impacted fishery resources on the Eel River.

12      58.    This fish ladder continues to cause injury and death to threatened NC steelhead and

13  CC Chinook salmon alike.

14      59.    Scott Dam has no fish passage facilities and therefore blocks all fish access above the

15  dam. Studies suggest that potential steelhead habitat upstream of Scott Dam ranges from 180 to 287

16  stream-miles. Indeed, approximately 99% of the habitat of what was the southernmost run of

17  summer steelhead on Earth is now blocked behind Scott Dam.

18      60.    NC steelhead have been listed as threatened, and therefore protected, under the ESA

19  since June 2000. Endangered and Threatened Species; Threatened Status of One Steelhead

20  Evolutionary Significant Unite (ESU) in California, 65 Fed. Reg. 36,074 (June 7, 2000) (to be

21  codified at 50 C.F.R. part 223); 50 C.F.R. § 223.102. Their designated critical habitat includes the

22  Eel River below Cape Horn dam. 50 C.F.R. § 226.211(g)(5).

23                          **The Potter Valley Project**

24      61.    The Potter Valley Project is a small hydropower project, which consists of Scott Dam

25  and Lake Pillsbury, Cape Horn Dam and Van Arsdale Reservoir (including associated fish passage

26  facilities), a diversion tunnel, and a powerhouse located on the East Branch Russian River. The

27  project functions as an inter-basin transfer system, diverting water from the Upper Eel River into the

28  Russian River across a natural watershed divide.

62.    The lower dam, Cape Horn Dam, was constructed in 1907. It now impounds less than 400 acre-feet of water in its Van Arsdale Reservoir.

63.    Cape Horn Dam includes fish passage facilities: a fish ladder and a structure known as a "fish hotel." Typically, a fish ladder, also known as a fishway, provides a method for migrating fish to travel past dams or other river obstructions. The Cape Horn Dam fish ladder contains a series of ascending pools that are reached by swimming against a stream of water. When a fish ladder functions properly, fish can leap through the cascade of rushing water, rest in a pool, and then repeat the process until they are out of the fish ladder. The "fish hotel" is simply the entrance to the fish ladder, constructed to help fish better find and climb the ladder.

64.    Due to the design, operation, and maintenance of the Cape Horn Dam fish passage facilities, the fish ladder subjects CC Chinook and NC steelhead to increased predation as they make their way both up and down the fish ladder. The Eel River channel is approximately 100 feet wide in the reach around Cape Horn Dam. But in the fishway, fish that can exceed two feet in length are restricted to a four-foot-wide channel without natural cover, rendering them more vulnerable to predation. Predators observed feeding in or from the fishway include Sacramento pikeminnow, smallmouth bass, otter, bald eagle, raccoon, and black bear.

65.    Predation is not just an issue when the fishway is open; when the fishway is closed during the migration period, salmonids are also vulnerable to predation as they attempt to hold above and below Cape Horn Dam.

66.    PG&E's operation and maintenance of the Cape Horn fishway also delays or prevents migration in several ways. The fishway's substandard design renders it unusable at times when fish are attempting to climb past Cape Horn Dam. PG&E routinely closes the inlet valve at the top of fish ladder to one inch when flows exceed 6,000 cfs. When PG&E does so, fish that are migrating through the fish ladder must turn around and in some cases are trapped in the fish ladder until flows drop below 6,000 cfs. When flows are forecast to exceed 10,000 cfs, PG&E fully closes the fishway at the bottom, and at flows exceeding 15,000 cfs, these closures are extended for longer periods because the fish ladder becomes clogged with debris. In both cases, PG&E does not open the fish ladder until blockages have been cleared and flows have reduced to below 2,500 cfs.

67.     Additionally, blockages of PG&E's Cape Horn fishway have repeatedly impaired and will continue to impair migration of salmonids. At flows greater than 15,000 cfs the fishway can become clogged with rocks and other debris, requiring the blockage to be cleared before the fishway can be reopened. Blockages and extended closures of the Cape Horn fishway have repeatedly impaired migration of salmonids in recent years due to PG&E's failed response to blockages. In 2019, as noted by the United States Fish and Wildlife Service ("USFWS") in its June 29, 2020 letter to FERC, the fishway was closed over 60% of the time or 36 days between mid-January and mid-March, which falls completely within the migration period of steelhead. A true and correct copy of USFWS' June 29, 2020 letter is attached as Exhibit 3.

68.     Importantly, NMFS recently noted in an October 13, 2022 letter to FERC that the Cape Horn Dam fish passage facility does not meet current fish passage standards. A true and correct copy of NMFS' October 13, 2022 letter is attached as Exhibit 4. NMFS also emphasized that even with new doors PG&E has installed on the fish hotel in an attempt to prevent blockages inside that structure, the fish ladder will still be vulnerable to blockage and inefficient for operations and maintenance. *See* Exhibit 4. Even if the fish hotel doors work perfectly, they cannot prevent continued blockage of the ladder above.

69.     The upper dam, Scott Dam, is located twelve miles upstream from the Cape Horn Dam and was constructed in 1921. Scott Dam impounds the Lake Pillsbury reservoir, which can hold approximately 70,000 ac-ft of usable water. The 130-foot high Scott Dam does not include any fish passage facilities. It thus completely blocks migrating salmonids from access to all fish habitat upstream of the dam. As a result, anadromous salmon and steelhead runs have been extirpated above Scott Dam.

70.     The Project began operating in 1922. Since that time, the Project has regulated Eel River flows below the dams, and PG&E and its predecessors have diverted water to the Russian River Basin for hydroelectric power generation and uses by the Potter Valley Irrigation District. The regulated flows on the Eel River are significantly lower and less variable than unimpaired flows, leading to temperatures likely to impair salmonid production and other impacts to river conditions, which also negatively affect the success of salmon and steelhead migration.

71.     FERC transferred the license for the Potter Valley Project to PG&E in 1930, and FERC renewed that license by order issued on October 4, 1983. At the time of the renewal, not enough information was available regarding the Project's impact on Eel River species, prompting FERC to require PG&E to conduct a study to determine the effects of the Project's flow regime on salmonids. After the conclusion of consultation with FERC on the state of threatened salmonids in the Eel River, NMFS issued a biological opinion in 2002 that concluded the proposed operation of the Project was likely to jeopardize the continued existence of CC Chinook salmon and NC steelhead and that it was likely to adversely modify designated critical habitat. Accordingly, the biological opinion identified a reasonable and prudent alternative for Project operation, which, at that time, NMFS anticipated would avoid jeopardizing listed species and avoid adverse modification to their habitat. FERC amended the 1983 license on January 28, 2004, implementing the 2002 biological opinion by incorporating the terms of the reasonable and prudent alternative. The terms and conditions of the license specify the minimum flows for the Eel River below each of the Project's dams and the timing for such flows, as well as other operating requirements. By its own terms, the existing license expired on April 14, 2022.

72.     The license for the Potter Valley Project contains several reopener provisions through which FERC retained the authority to modify the terms and conditions of the license for the conservation and protection of fish and their habitat. Article 46 of the license provides that FERC "reserves the right to require changes in the project works or operations that may be necessary to protect and enhance [environmental] resources and values," and in Article 52, FERC "reserves the right to require changes" to the license to implement the 2002 biological opinion.

73.     In anticipation of the license expiration, on April 6, 2017, PG&E filed a Notice of Intent to file an application for a new license and pre-application document. On January 25, 2019, PG&E filed a Notice of Withdrawal of Notice of Intent to File License Application and Pre-Application Document, indicating it was discontinuing its efforts to relicense the Project. On March 1, 2019, FERC issued a Notice Soliciting Applications for interested applicants other than PG&E to take over operation of the Project.

74.     In response to FERC's solicitation, on June 18, 2019, parties that were acknowledged proxies for a new, intended regional entity submitted a notice of intent to file an application for a new license. Ultimately, the new regional entity was not formed and did not complete the final license application.

75.     On April 14, 2022, the license and biological opinion expired by their own terms.

76.     On April 21, 2022, FERC issued a Notice of Authorization for Continued Project Operation which granted PG&E an annual license to operate the Project that will automatically renew on April 14th each year until a new license is issued or the Project is otherwise disposed of. The annual license allows PG&E to operate the Project pursuant to the same terms and conditions as the expired license.

77.     On May 11, 2022, FERC sent PG&E a letter requesting that PG&E provide a plan and schedule for filing a surrender application to address decommissioning of the Project. In this letter, FERC acknowledged its authority to "reopen and amend the license" to include protective measures for listed fish.

78.     On May 20, 2022, Plaintiffs filed a petition for rehearing, reconsideration, and/or discretionary action regarding FERC's April 21, 2022 Notice of Authorization for Continued Project Operation issuing an annual license for the Project. In the petition, Plaintiffs alleged that FERC violated Section 7 of the ESA by issuing the annual license without meeting its obligations to ensure that the operation of the Project is consistent with the conservation of listed species and is not likely to jeopardize the continued existence of listed species or destroy or adversely modify their designated habitat. Additionally, Plaintiffs argued that FERC did not initiate or reinitiate the consultation with NMFS regarding the Project's effects on listed species and their designated critical habitat as required by the ESA, despite the fact the Project may affect listed species in a manner or by activities not previously considered. Plaintiffs also alleged that FERC violated and is violating Section 9 of the ESA by issuing the annual license which authorizes an activity that unlawfully takes listed species. To remedy these alleged violations, Plaintiffs requested that FERC reconsider its issuance of the annual license, amend the annual license to ensure that the Project is operated in a

manner consistent with the conservation of listed species, and reinitiate the necessary consultation with NMFS regarding the Project's impacts on listed species and their habitat.

79.     The petition for rehearing was denied by operation of law on June 21, 2022, and FERC issued an order addressing the arguments and sustaining the denial of the petition on July 28, 2022. FERC's main stated reason for denying rehearing is that it lacks the discretion to modify the terms and conditions applicable to the annual license, an assertion not supported by the law. Petitioners sought judicial review of the Notice of Annual License and the Order Addressing Arguments Raised on Rehearing by timely filing and serving petitions for review in the Ninth Circuit on August 15, 2022 (Case No. 22-70182) and September 23, 2022 (Case No. 22-1589). *See* 16 U.S.C. § 825*l*(b).

80.     On July 8, 2022, PG&E submitted a plan and schedule for PG&E's surrender application for the Project. That plan and schedule states that PG&E will file a surrender application and decommissioning plan 30 months after FERC approves its plan and schedule. On July 29, 2022 FERC approved PG&E's proposed schedule, noting that it expects PG&E to file a surrender application within 30 months, or by January 2025.

81.     On November 16, 2022, FERC issued a Notice of Proceeding to Consider Reopening License and Soliciting Comments, Motions to Intervene, and Protests for the Potter Valley Project. According to this notice, after opportunity for a hearing FERC "may find cause to reopen the annual license terms to require changes in the Project works or operations that may be necessary to protect federally listed species."

82.     On December 9, 2022, Plaintiffs, as Movant-Intervenors, filed a Motion to Intervene in FERC's proceeding to consider reopening the Project annual license. Plaintiffs asserted that FERC must reopen and amend the annual license to bring it into compliance with the ESA. Plaintiffs further reiterated that FERC has continued to violate Section 7 of the ESA by failing to ensure that operation of the Project is consistent with the conservation of CC Chinook salmon and NC steelhead and by failing to reinitiate consultation with NMFS regarding the Project's effects on listed species.

83.     On December 16, 2022, PG&E filed a protest and comments opposing the proceeding to consider reopening the license and asking FERC to terminate the proceeding. PG&E argued that

1    there is no cause to reopen the annual license terms because the Project is not causing unanticipated,

2    serious impacts on fishery resources, "and none of the reasons for reinitiating consultation under

3    section 7 of the Endangered Species Act[] are present." PG&E also asserted that it is in the process

4    of surrendering the license for the Project, which will entail additional reviews and assessments by

5    FERC, NMFS, and other resource agencies, making it "premature" to engage in any process

6    concerning the Project.

7                          **NMFS's 2002 Biological Opinion**

8        84.    At the time of the 1983 relicensing proceeding, FERC did not have adequate

9    information to determine the Project's effects on fish and wildlife. Accordingly, FERC required

10   PG&E to conduct a 10-year study to determine the effects of the license's flow regime on salmonid

11   fishery resources in the Upper Eel River and East Branch of the Russian River. FERC further

12   required PG&E, in consultation with the California Department of Fish and Game (now the

13   Department of Fish and Wildlife) and the United States Fish and Wildlife Service, to develop

14   "recommendations for modifications in the flow release schedule or project structures and operations

15   necessary to protect and maintain the fishery resources," based on the results of the study. FERC,

16   *Opinion and Order Denying Appeal, Approving Settlement, and Issuing New License (Major)*, 25

17   F.E.R.C. ¶ 61,010 (Oct. 4. 1983), Doc. Accession No. 19831007-0243, Art. 39.

18       85.    After completion of the study and 18 months of collaboration with the fisheries

19   agencies, PG&E developed a proposal for a new flow regime. FERC selected this proposal as the

20   preferred alternative in a Draft Environmental Impact Statement released in February 1999.

21       86.    In March 1999, at NMFS's request, FERC initiated consultation with NMFS

22   regarding the impact of the preferred alternative/PG&E's proposed flow regime on ESA-listed

23   salmonid species. The consultation process concluded in November 2002 when NMFS issued a

24   biological opinion.

25       87.    NMFS determined in its biological opinion that the preferred alternative's proposed

26   flow regime was likely to jeopardize the continued existence of CC Chinook salmon and NC

27   steelhead and that it was likely to adversely modify designated critical habitat.

28

88.     In light of this finding, NMFS developed a reasonable and prudent alternative to the proposed action, which modified the Project's flow regime by requiring that more water be released from the dams and adjusting the timing of flow releases to better mimic the natural hydrograph. The components of the reasonable and prudent alternative include minimum flows of the Eel River below Cape Horn Dam, minimum flows of the Eel River below Scott Dam, minimum flows to the East Branch Russian River, an amount of water ("blockwater") reserved for release at the discretion of the fisheries agencies each year, and various non-flow provisions.

89.     At the time that NMFS issued the biological opinion, it expected that implementation of this reasonable and prudent alternative would avoid jeopardy to ESA-listed salmonids and would avoid adverse modification of their habitat.

90.     Accordingly, NMFS issued an incidental take statement which provided, "taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the ESA provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement." The incidental take statement noted that it was applicable to "all activities related to the PG&E Potter Valley Project (P-77-110) pursuant to the reasonable and prudent alternative described in the biological opinion," but that it "does not cover activities that are not described and assessed within the [o]pinion."

91.     Cape Horn Dam, its fishway, the associated infrastructure, fishway maintenance, and flow operations to achieve fish passage at the passage facility are not described within the Description of the Proposed Action in the biological opinion. Nor are their effects to listed species assessed within the biological opinion. By its terms, the incidental take statement does not exempt activity that falls outside of the actions allowed under the reasonable and prudent alternative, and the reasonable and prudent alternative does not contemplate any activity associated with the operation of Cape Horn Dam or the Cape Horn fishway.

92.     FERC incorporated the reasonable and prudent alternative into the terms and conditions of the existing project license through amendments adopted on January 28, 2004. FERC, *Order Amending License*, 106 FERC ¶ 61,065 (Jan. 28, 2004).

93.     Contrary to NMFS's expectations, implementation of the reasonable and prudent alternative has not provided the expected benefits to ESA-listed salmonids.

**PG&E's ESA Violations**

94.     PG&E's operation and maintenance of the Potter Valley Project has caused and is causing take in violation of the ESA by continually and unlawfully harming and harassing CC Chinook salmon and NC steelhead.

95.     PG&E's operation and maintenance of the Project causes take by failing to maintain water temperatures, both above and below Cape Horn Dam, at a level conducive to salmonid survival. Warm water released from Lake Pillsbury has harmed NC steelhead and reduced overall steelhead production below Scott Dam. This warm water has also exacerbated predation of NC steelhead by Sacramento pikeminnow and other invasive warm-water fish. If Scott Dam did not block access to hundreds of miles of high-quality habitat in the upper reaches of the Eel River, NC steelhead would be able to migrate upstream to cold-water spawning habitat where they have a comparative advantage over pikeminnow and other warm-water predators.

96.     Water temperatures above 18.0°C (64.4° F) constitute high-risk conditions for steelhead trout, but in nine of the last eleven years, Scott Dam releases have exceeded 20.0°C (68.0° F). Temperatures have exceeded 23.0°C (73.4° F ) in five of those years, levels which NMFS characterized in its October 2022 letter to FERC as "intolerable" and "potentially lethal." *See* Exhibit 4. Under PG&E's operation, the Project has not consistently provided thermally accessible summer rearing habitat needed for increased steelhead trout production.

97.     CC Chinook have similar water temperature tolerances as NC steelhead. PG&E has harmed and harassed CC Chinook by releasing warm water from Lake Pillsbury, thereby increasing the risk of predation and causing other warm water-triggered adverse effects to CC Chinook.

98.     Because of PG&E's release of warm water from Lake Pillsbury, the reasonable and prudent alternative is not providing the benefits to NC steelhead and CC Chinook salmon anticipated in the biological opinion.

99.     PG&E is harming and harassing CC Chinook and NC steelhead by causing water to spill over Cape Horn dam without adequate protections to prevent juvenile fish from falling to their death and injury as they tumble over the face of the dam directly onto rocks below.

100.     PG&E is also harming and harassing the fish by operating and maintaining a fishway at Cape Horn dam that subjects CC Chinook and NC steelhead to increased predation as they hold at entrances to the fish ladder and make their way both up and down the fish ladder. In the Cape Horn Dam fish ladder, fish are confined to a narrow four-foot-wide channel in the fishway without a natural cover, making them more vulnerable to predation.

101.     Additionally, due to the fishway's design and PG&E's operation and maintenance of the fishway, it becomes unusable and is closed at times during the migration period, making salmonids more vulnerable to predation as they attempt to hold above and below Cape Horn Dam.

102.     Moreover, PG&E's operation and maintenance of the Project blocks and impedes access to spawning habitat and hinders out-migration by juveniles, significantly impairing essential spawning, migrating, and breeding behavior. Scott Dam lacks any fish passage facilities and thus completely blocks access to hundreds of stream-miles of high quality spawning and rearing habitat above the dam. Similarly, Cape Horn Dam restricts fish passage to the remaining habitat between Cape Horn and Scott dams, providing only a limited corridor for migration.

103.     By operating and maintaining structures that block or impede migration and access to habitat, PG&E is significantly impairing essential behavior patterns including spawning, rearing, and migrating. In so doing, PG&E is killing and injuring ESA-listed threatened fish, and increasing their risk of injury and extinction in various ways. For example, by delaying listed salmonids from reaching their spawning grounds, PG&E exposes them to increased predation and other stochastic events that can cause death or injury before they lay their eggs. PG&E also is creating ecological traps that lead protected fish to make maladaptive habitat choices. Threatened fish may lay their eggs in suboptimal locations, for example, which leads to lower species survival. Likewise, the Cape Horn fishway creates an ecological trap by impeding downstream passage of out-migrating juveniles that are trying to reach the ocean.

104.     None of the take that is occurring is authorized.

105.     The plain language of the 2002 biological opinion and incidental take statement shows that NMFS's take authorization terminated upon the expiration of the existing license term (i.e., April 14, 2022). When describing the proposed action being evaluated, the biological opinion states that "[u]pon closure of this FERC proceeding, the flow regime and modifications that are selected will remain in effect for the next twenty years, until 2022." Likewise, when describing the effects of the proposed action, the biological opinion notes "that the license for the Project will be in effect for the next twenty years until 2022 when the license expires." These statements indicate that NMFS considered impacts to salmonids and salmonid habitat only through 2022 and did not authorize take beyond the life of the license then currently in place. Accordingly, as of April 14, 2022, any authorization for take in the 2002 biological opinion expired.

106.     On March 16, 2022, NMFS sent FERC a letter confirming that the biological opinion expired on April 14, 2022. NMFS noted that "[t]he 20-year duration of the proposed action is a central component of the [biological] opinion." A true and correct copy of NMFS' March 16, 2022 letter is attached as Exhibit 5.

107.     Additionally, PG&E's implementation of the reasonable and prudent alternative is causing take in ways not anticipated in the biological opinion, which separately invalidates the biological opinion and triggers the requirement for FERC to reinitiate consultation with NMFS under the ESA. *Center for Biological Diversity v. U.S. Bureau of Land Mgt.,* 698 F.3d 1101, 1108 (9th Cir. 2012) ("When reinitiation of consultation is required, the original biological opinion loses its validity, as does its accompanying incidental statement . . . .").

108.     The reasonable and prudent alternative's summer flow component, in particular, is not providing the anticipated benefits to ESA-listed salmonids due to dangerously high water temperatures and the resultant predation of threatened fish by pikeminnow and other invasive species. The biological opinion evaluated changes to the flow regime with the objective of mimicking the natural hydrograph of the Eel River; but critically, the biological opinion never evaluated or considered the effects of water temperatures below Scott Dam on threatened fish. The biological opinion did not anticipate take of listed fish caused by high water temperatures below Scott Dam, and thus the incidental take statement does not exempt this take.

109.    The incidental take statement also never authorized take caused by PG&E's operation and maintenance of the Cape Horn Dam and associated fishway. The incidental take statement does not exempt activity that falls outside of the actions allowed under the reasonable and prudent alternative, and the reasonable and prudent alternative does not contemplate any activity associated with operation of Cape Horn Dam or the Cape Horn fishway. PG&E's operation and maintenance of Cape Horn Dam and the fishway are therefore not exempt from Section 9 take liability.

110.    NMFS further corroborated in its March 16, 2022 letter that the biological opinion did not describe or assess the effects of Cape Horn Dam, the associated infrastructure, fishway maintenance, and flow operations to achieve fish passage at the passage facility. *See* Exhibit 5. Thus, the biological opinion did not authorize incidental take resulting from these effects (e.g., delayed or blocked migration and increased predation of ESA-listed salmonids caused by the configuration and full operation of the Cape Horn Dam fish passage facility).

111.    On April 15, 2022, Plaintiffs sent a letter to the Secretary of Commerce and Defendant PG&E requesting immediate action to remedy Defendant's past and ongoing violations of the ESA resulting from continued take of ESA-listed fish species despite the expiration of NMFS's incidental take statement. Exhibit 1. On November 11, 2022, Plaintiffs sent an amended notice of intent to initiate litigation under the ESA to the Secretary of Commerce and Defendant PG&E. Exhibit 2. These letters constituted formal notice of intent to initiate litigation under the citizen suit provision of the ESA. *See* 16 U.S.C. § 1540(g)(2).

112.    In a May 11, 2023 letter, NMFS reiterated to FERC that "the Cape Horn Dam Fish Passage Facility currently does not have ESA take coverage and is likely non-compliant with NMFS fish passage guidelines." A true and correct copy of NMFS' May 11, 2023 letter is attached as Exhibit 6.

## CAUSE OF ACTION

### Violation of Section 9 of the ESA

113.    Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

114.   Defendant's operation and maintenance of the Potter Valley Project harms, harasses, and otherwise causes "take" of CC Chinook salmon and NC steelhead in the Eel River watershed, in violation of the ESA, 16 U.S.C. §§ 1538(a)(1)(B), 1538(a)(1)(G); 50 C.F.R. § 223.203.

115.   Defendant's operation and maintenance of the Project is causing take of CC Chinook salmon and NC steelhead by

    a.   maintaining water temperatures below Cape Horn and Scott dams that are harmful to threatened salmonids;

    b.   operating and maintaining Cape Horn Dam and fishway in a manner that increases the risk of injury and directly causes death and injury to ESA-protected fish; and

    c.   blocking and impeding access to spawning habitat above Cape Horn and Scott dams and inhibiting out-migration by juveniles.

116.   None of the take that is occurring is authorized.

    a.   The incidental take statement issued in conjunction with the 2002 biological opinion expired on its own terms, is no longer operative, and accordingly does not authorize any of the ongoing take described above.

    b.   Additionally, even if it had not expired, the biological opinion and incidental take statement are separately invalid because the Project is causing take in ways not considered and not anticipated in the biological opinion. The 2002 biological opinion never evaluated or considered the effects of water temperatures below Scott Dam on threatened fish. Moreover, the reasonable and prudent alternative summer flow component is not providing the anticipated benefits to ESA-listed salmonids due to unanticipated and dangerously high water temperatures and the resultant increased predation of threatened fish by pikeminnow and other invasive species. As a result, reinitiation of consultation under the ESA is required, and the biological opinion and incidental take statement are no longer valid. *Center for Biological Diversity,* 698 F.3d at 1108.

    c.   Finally, PG&E's actions are causing take in ways that were never covered by the incidental take statement. Specifically, the incidental take statement never covered

30

PG&E's operation of Cape Horn Dam and its associated fishway, and any resulting take from operation and maintenance of Cape Horn Dam and its fishway is unlawful.

**PRAYER FOR RELIEF**

For the reasons stated above, Plaintiff respectfully requests an order from this Court:

1.   Declaring that Defendant has violated and continues to violate the ESA by taking listed CC Chinook salmon and NC steelhead without authorization;

2.   Enjoining Defendant from operating and maintaining the Potter Valley Project in a manner that violates Section 9 of the ESA, 16 U.S.C. §§ 1538(a)(1)(B) and (G), and the Act's implementing regulations;

3.   Awarding Plaintiffs their costs and attorneys' fees pursuant to 16 U.S.C. § 1540(g)(4); and

4.   Granting such other relief as may be just and proper.

Dated this 16th day of May, 2023.                Respectfully submitted,

ANNA K. STIMMEL (State Bar No. 322916)
KATRINA A. TOMAS (State Bar No. 329803)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, California 94111
Telephone: (415) 217-2000
Facsimile: (415) 217-2040
astimmel@earthjustice.org
ktomas@earthjustice.org

Attorneys for Plaintiffs PACIFIC COAST
FEDERATION OF FISHERMEN'S
ASSOCIATIONS and INSTITUTE FOR
FISHERIES RESOURCES

KEVIN P. BUNDY (State Bar No. 231686)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MATTHEW S. McKERLEY (State Bar No. 332160)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone: (415) 552-7272
Facsimile: (415) 552-5816
bundy@smwlaw.com
mmckerley@smwlaw.com

Attorneys for Plaintiffs FRIENDS OF THE EEL RIVER, CALIFORNIA TROUT, and TROUT UNLIMITED

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. XX-cv-XXXX